IN THE MATTER OF ANTON J. HOLLENDONNER,
AN ATTORNEY-AT-LAW.

Argued September 11, 1985—Decided October 17, 1985.

*David E. Johnson, Jr.,* Director, argued the cause for Office of Attorney Ethics.

*Robert A. Farkas,* argued the cause for respondent (*Marinari & Farkas,* attorneys).

22

PER CURIAM.

The District VII Ethics Committee (local Committee), acting on a complaint brought by the Office of Attorney Ethics, conducted a hearing and thereafter filed a presentment against Respondent, Anton J. Hollendonner, a member of the bar since 1955. The presentment charged Hollendonner with two instances of misappropriation of client funds, contrary to DR 9-102(A), (B), and (C), and DR 1-102(A)(1), (3), (4), and (6); mismanagement of his trust account contrary to Rule 1:21-6(b)(1); overdrawing his trust and business accounts, contrary to DR 9-102(A), (B), and (C); issuing checks against uncollected funds; and violating Canon One of the Code of Judicial Conduct ("A judge should uphold the integrity and independence of the judiciary.").

The Disciplinary Review Board (DRB) conducted hearings on the presentment. It then issued its Decision and Recommendation, which summarized the charges and relevant evidence in pertinent part as follows:

DE ANGELO MATTER

Respondent was a member of the Trenton Lodge 105 of the Benevolent and Protective Order of Elks. As its Justice of the Subordinate Forum, he rendered legal advice to his lodge. When the lodge purchased a new building in West Trenton, he donated his legal services to it in lieu of a contribution to its fund-raising drive. However, neither he nor the Elks anticipated that this would become so time-consuming as a result of unanticipated litigation in opposition to the purchase. Informal discussions occurred with lodge members concerning the possibility of Respondent's receiving a fee when the lodge's former building in Trenton was sold. Respondent represented the lodge in its negotiations with Philip T. DeAngelo and his attorney for the sale of the Trenton property for $27,000. Respondent received a $2,000 check from Mr. DeAngelo's attorney on April 2, 1980, and was advised to hold this in escrow pending completion of the sale agreement. Respondent wanted to buy a used car but lacked sufficient cash in hand to do so without borrowing the money. In a discussion with lodge officers, he proposed that he take the deposit money as his fee since the lodge expected to receive about $6,000 or $7,000 in cash from the sale of the property. The lodge officials agreed to this. He failed to explain in detail that the deposit was subject to the sales contract. Instead, Respondent indicated that no problem was anticipated regarding the completion of the transaction. Realizing that escrow monies might not be used without the consent of both parties, he believed that this money might be used because it was nonrefundable. He issued a check for $1,600 to the car dealer on April 23,

1980, which was drawn against the escrow account for the lodge; the balance was used for other personal expenses.

At some point, Respondent learned the City of Trenton had removed the lodge property from its tax-exempt status since it was vacant and not used for charitable purposes. Approximately $5,000 in real-estate taxes was assessed against it. Respondent was not sure if he learned of this before or after he withdrew the escrow monies. However, he believed that the lodge would prevail since the City admitted that the lodge property was originally tax-exempt. He believed that he could get the City to waive the taxes, but he was unsuccessful in that regard. Respondent maintained that had he known that the City would not waive the taxes, he would not have taken the $2,000 because the lodge would have had to pay the tax lien before the property could be sold. Since the lodge had to pay the lien, Respondent decided to return the $2,000 fee and absorb the loss. The $2,000 was returned to the Elks by a check from Respondent's trust account dated July 9, 1980. This check was not cashed until August 19, 1980. Respondent maintained that he used his fee from an unrelated appeal matter to reimburse the lodge.

By letter dated February 13, 1984, Edward Davis, past-Exalted Ruler of the Elks, informed the Office of Attorney Ethics that Respondent had been authorized to withdraw the $2,000 from the account.

RAMPF MOLDS MATTER

Respondent had been retained since 1980 as corporate attorney for Rampf Molds Industries, Inc. During 1982–83, when the company decided to close its Florida plant and relocate in Rocky Hill, New Jersey, Respondent handled the legal aspects. He received a $5,000 fee on December 10, 1982, and deposited it in his trust account for the company. On December 13, 1982, he withdrew $1,170 from this account as part of his fee.

Respondent was randomly selected for a compliance audit of his books and records. An office visit was conducted on March 29, 1983. During that office visit, the auditor photocopied various account ledger sheets that showed significant balances. Respondent was not aware of this. On April 21, 1983, during a follow-up visit, the auditors discovered that the ledger card for Rampf Molds in Respondent's office contained additional entries. At the Committee hearing Respondent ultimately conceded that he had made the additions on the ledger card after being informed by the auditor that three checks marked "void" in the check book had been issued. After the March 29, 1983, audit, Respondent went through his accounting records and located the sources of some checks that could not be determined during that audit visit. After reviewing the Rampf Molds records, Respondent concluded that the three "void" checks had been drawn against this retainer account and used by him for personal obligations. He decided to rewrite the ledger sheet to include these checks because he felt that this omission could be construed as improper record keeping. He added to the ledger sheet check number 4045 for $1,200 dated January 18, 1983; check number 4047 for $666.41, and check number 4049 for $422.06, both dated January 13, 1983. When the auditors returned for the second visit, which Respondent had not anticipated, he did not inform them of what he had done. He later claimed that he kept silent because he was reluctant to admit that he

had made a mistake. After adjusting this ledger sheet and withdrawing $2,359 for legal fees, Respondent ended up with a deficit balance of $859.95 in this account. To bring it back into the black, Respondent requested and received his $2,400 retainer from the company. This was recorded March 30, 1983.

RANDOM AUDIT

Respondent was notified March 4, 1983, that he had been selected for a random audit of his records. His office was visited on March 29, and April 21, 1983. After reviewing Respondent's records, the auditor in charge concluded:

Mr. Hollendonner did not have good accounting records. In fact, his records were poor for his trust account. He just had a check book, which was kept in a very poor state. He had this client ledger book, in which these ledger sheets were kept in a rather poor state.

The auditor discovered that Respondent kept no receipts or disbursement journals. Respondent did not routinely reconcile his check book and had not reconciled his client ledger balances with funds on deposit in his trust account. The auditor further concluded:

Review of trust account bank statements and related checks showed a pattern of negative bank balances, return of checks to payees because of insufficient funds, and failure to comply with mandated rules for preserving clients' funds and required record keeping.

A schedule of the clients' trust ledger as of March 31, 1983, and a reconciliation with the bank statement for the month then ended showed the trust account was short by $2,502.93.

Review of client's ledger showed that a credit balance of $6.00 in favor of the client was incorrect. The account should have reflected a *negative balance of $594.99 resulting from a duplicate payment in May 1982.*

Review of client's ledger account showed that a check for $911.00 issued in *May 1982* had not cleared the bank as of *March 1983*. However, the amount of funds on deposit in May 1982 and June 1982 was insufficient to have honored the check for $911.00 had it been presented for payment.

Trust account checks drawn out of sequence were issued for Mr. Hollendonner's personal obligations. Additionally, trust checks drawn to Mr. Hollendonner's order were not deposited to the business account.

The audit showed Mr. Hollendonner to have violated DR 9–102(A) by failure to preserve the funds of clients; DR 9–102(B)(3) and (4) by failure to maintain complete records of all funds coming into his possession and promptly to pay funds in his possession which the client is entitled to receive; and DR 9–102(C) by failure to comply with the provisions of *R.* 1:21–6.

The Audit Report concluded that

Mr. Hollendonner's explanatory offering as regards the overdrawn condition only serves to amplify his apparent disregard of DR 9–102 and *R.* 1:21–6:

I found it necessary to leave various sums of money in the account because of bank service charges, and because of mathematical errors, in order to avoid, as much as possible, overdrafts. Whenever there was such an overdraft, it was usually a small amount, or due to the fact that a deposit had not yet cleared when the checks were presented for payment.

Respondent did not believe that he had to transfer funds from his escrow account to his business account when he withdrew his fees. After the audit, he reviewed his entire records, corrected all deficits, and balanced his accounts. Also, he updated his accounting procedure to a computer. Later, he testified:

I'd like to point out that everything, whether it's a negative balance or whether it's an excess, it's clearly shown in the ledger. There's no attempt to misrepresent or mislead. It's there.

Concerning the double payment of $600.99 to a client, Respondent explained he first issued the client a check on April 29, 1982, after she sold her house. The client contacted him on May 12, 1982, stating that she had misplaced the check. He immediately stopped payment, voided the check, and issued her another one. The audit disclosed the client had cashed both checks. When Respondent initially contacted the client, she insisted that only one check had been cashed. After Respondent reviewed his cancelled checks, he found that two had been issued and cashed by her. She then remembered cashing both checks. Respondent had known this client for about 20 years, trusted her, and believed that this had just been a mistake on her part.

The facts recited above were developed at the hearing before the local Committee. That body found that because the contract of sale between the Elks Lodge and DeAngelo was silent regarding the escrow money, it was presumed that these funds were not to be released to the seller until closing of title. It concluded that the use of these funds by Respondent constituted a misappropriation under *In re Wilson*, 81 *N.J.* 451 (1979). It further found that Respondent had violated Rule 1:21–6(a)(2), in that if Respondent was entitled to these funds, they should have first been transferred to his business account before he used them. The Ethics Committee also found a violation of Rule 1:21–6(b)(1) because Respondent had failed to maintain records of this transaction. In addition, it found violations of DR 9–102(A), (B), and (C), and DR 1–102(A)(1), (3), (4), and (6).

Concerning the Rampf Molds transactions, the Committee concluded that Respondent's records were totally inadequate to permit it to trace or determine the source of the funds. Noting Respondent's trust check register had falsely indicated that these checks had been voided, the Committee concluded that there was a misappropriation of these funds when the checks were drawn. It further observed that the allegations charging trust account mismanagement were essentially admitted and uncontested, and it found Respondent had failed to maintain the

receipt and disbursement journals for his trust account as required by Rule 1:21–6(b)(1). The Committee found the evidence to be clear that Respondent had overdrafts or shortages in both accounts as alleged, which constituted a violation of DR 9–102(A), (B), and (C). Regarding the charge of issuing checks against uncollected funds, the Committee found a violation of ACPE Opinion 454, which directs that an attorney shall not disburse funds until they have been collected by the bank. The Committee concluded further that the evidence clearly and convincingly disclosed that there had been a violation of Canon One of the Code of Judicial Conduct.

Although it did not agree with all of the conclusions of the local Committee, the DRB determined that the Committee's findings of unethical conduct were fully supported by clear and convincing evidence. Its report expressed that conclusion as follows:

> As the attorney for the Elks lodge, Respondent received a check for $2,000 from the prospective purchaser of the lodge's former building. When he desired to purchase an automobile, he decided the $2,000 deposit would adequately compensate him for his services. He discussed this with the officials of the lodge and they agreed that he could take the money. However, the record clearly shows Respondent did not fully explain the duties and obligations of an escrowee to these officials, but instead stressed that in his opinion the money belonged to the lodge because the sale's contract was an unconditional agreement. The Ethics Committee found Respondent's action here rose to the level of misappropriation under *In re Wilson, supra,* 81 *N.J.* 451. In *Wilson,* the Court, in a footnote, described misappropriation as meaning
>
> > any unauthorized use by the lawyer of client's funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom.
> >
> > [*Id.* at 455 n. 1.]
>
> The case in hand is clearly distinguishable from the *Wilson* definition of misappropriation. Here, Respondent had his client's authorization to take the funds after he had explained the situation, albeit his explanation was deficient with regard to the legal duties of an escrowee. There was no surreptitious conduct by Respondent. The record does not suggest that he would have utilized the money if his client had disapproved of his proposal. Nevertheless, Respondent's actions were improper. It is well settled that an escrow holder acts as an agent for both parties. See *Mathis v. Yarak,* 71 *N.J.Super.* 234, 238 (App.Div.1961); *Cooper v. Bergton,* 18 *N.J.Super.* 272 (App.Div.1952); *Mantel v. Landau,* 134 *N.J.Eq.* 194 (Ch.1943). This relationship with the parties is

distinguishable from an agent who acts exclusively in the interest of one party. *Kamm's Estate v. C.I.R.*, 349 *F*.2d 953, 956 (3d Cir.1965).

Because of his status as escrowee, Respondent owed a fiduciary duty both to his client, the seller, and to the buyer. The $2,000 deposit was not to change hands unless and until the sale of the building took place. Until that time, this money remained the property of the buyer. Respondent did not fully explain to his client the duties of an escrowee, and a client cannot be expected to foresee the ramifications of a legal duty. *See In re Lanza*, 65 *N.J.* 347, 352–53 (1974). An escrowee cannot use those funds without permission of both parties. Although Respondent conceded that he knew his client could not give permission on behalf of the second party to an escrow agreement, he apparently did not fully comprehend the duties of an escrowee. Nevertheless, ignorance of the rules is no excuse. *Matter of Eisenberg*, 75 *N.J.* 454, 456–57 (1978). His misconduct here violated DR 9–102 in that he misused funds entrusted to him.

The Ethics Committee found that Respondent had misappropriated $2,200 from his client, Rampf Molds, by issuing three checks from his trust account to pay personal obligations. The Committee's conclusion was based on the fact that Respondent (1) had marked these checks void in his records; (2) altered this client's ledger sheet after the first audit visit to reflect issuance of these checks in January 1983; and (3) was unable to trace these funds to show that they had emanated from earned fees. At the Board's hearing on September 19, 1984, counsel for the Office of Attorney Ethics conceded that there was no misappropriation after he had received and verified a letter from this client stating that it had paid Respondent a $5,000 fee in December 1982. Based on this, the Board does not now accept this Ethics Committee finding of misappropriation, but does find a violation of proper record keeping procedures. Rule 1:21–6 clearly sets forth the required record-keeping procedure for attorneys. Respondent's records failed to measure up to this standard.

## The DRB then addressed the subject of its recommended discipline:

"Discipline is generally regarded as nonpunitive in its essence. The primary purpose is to protect the public against members of the bar who are unworthy of the trust and confidence essential to the relationship of attorney and client." *In re Introcaso*, 26 *N.J.* 353, 360 (1958). In evaluating the appropriate discipline in this case, the Board has considered Respondent's nearly 30 years as a member of the Bar. He has no prior history of disciplinary action, has admitted his wrongdoing, and has taken steps to bring his accounting records into compliance with the rules. No clients were injured by his actions. Respondent's misuse of the escrow fund was not done secretly. He asked his client for permission. This 60–year-old Respondent has been active in the community, both politically and professionally. When the charges were sustained against him, he resigned his Municipal Court judgeship because he felt his "continued service on the bench might become a source of embarrassment to the communities in which [he] sat, or it might reflect in some way, upon the integrity of the Judiciary."

"The severity of discipline to be imposed must comport with the seriousness of the ethical infractions in light of all the relevant circumstances." *In re*

*Nigohosian*, 88 *N.J.* 308, 315 (1982). "Contrition and admission of wrongdoing are mitigating factors in respondent's favor." *In re Rosenthal*, 90 *N.J.* 12, 17 (1982); *In re Horan*, 78 *N.J.* 244, 247 (1978). Other mitigating factors are relevant. *In re Hughes*, 90 *N.J.* 32, 36 (1982).

The Board unanimously determines Respondent's misconduct does not warrant disbarment because his actions did not rise to the level of a misappropriation under *In re Wilson, supra*, 81 *N.J.* 451. The unauthorized withdrawal of the Elks/DeAngelo escrow monies, however, is a clear violation of DR 9–102. The Board also finds, unanimously, that the charges relating to improper record keeping, including failure to maintain required records, using the trust account for personal obligations, and drawing checks against uncollected funds with resulting bank shortages, are sustained. DR 9–102(A), (B), and (C). Under the totality of the circumstances presented here, a requisite majority of the Board recommends that Respondent be suspended from the practice of law for a period of six months. A minority finds a public reprimand to be sufficient discipline in this case.

█ We have carefully canvassed the record, mindful of our obligation to make independent findings of fact as judged by the requisite standard of clear and convincing evidence, and are in complete agreement with the findings of the DRB in respect of the Respondent's various ethical infractions. The findings recited above we adopt as our own.

As to the appropriate discipline to be imposed, however, we must reject the recommendation of the DRB to impose a six-month suspension. The misuse of escrow funds and the appalling disregard of proper record-keeping procedures, both as recited at length above, demonstrate an entirely unacceptable insensitivity to basic ethical considerations.

█ As the DRB observed, absent some extraordinary provision in an escrow agreement, absent here, it is a matter of elementary law that when two parties to a transaction select the attorney of one of them to act as the depository of funds relevant to that transaction, the attorney receives the deposit as the agent or trustee for both parties. *Mantel v. Landau*, 134 *N.J.Eq.* 194, 195 (Ch.1943), aff'd, 135 *N.J.Eq.* 456 (E. & A.1944); *see Mathis v. Yarak*, 71 *N.J.Super.* 234, 238 (App.Div.1961). The parallel between escrow funds and client trust funds is obvious. So akin is the one to the other that henceforth an attorney found to have knowingly misused escrow funds will confront the disbarment rule of *In re Wilson, supra*, 81 *N.J.*

451. We do not apply that rule in these proceedings in view of the absence of clear and convincing evidence that Respondent invaded the escrow funds with knowledge that the use of those funds was improper. Moreover, this is the first occasion on which we have addressed the near identity of escrow funds and trust funds.

Even as the proofs stand Respondent's professional derelictions are most serious. In our view they warrant nothing less than suspension for a period of one year. In addition, Respondent is to reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

### ORDER

It is ORDERED that ANTON J. HOLLENDONNER of NORTH TRENTON, who was admitted to the Bar of this State in 1955, be suspended from the practice of law for one year, effective November 4, 1985, and it is further

ORDERED that ANTON J. HOLLENDONNER be and hereby is restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.