611 A.2d 1111

IN THE MATTER OF JOSEPH F. FLAYER,
AN ATTORNEY AT LAW.

July 13, 1992.

ORDER

The Disciplinary Review Board having filed a report with the Court, recommending that JOSEPH F. FLAYER of BUDD LAKE, who was admitted to the bar of this State in 1976, be publicly reprimanded for violating *RPC* 1.15(a), (b) and (c) by releasing escrowed funds without the consent of the seller in a personal real estate transaction, and *RPC* 8.1(b) by failing to cooperate fully with the ethics authorities, and good cause appearing;

It is ORDERED that the report and recommendation of the Disciplinary Review are adopted and JOSEPH F. FLAYER is hereby publicly reprimanded; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.

## APPENDIX

### *Decision and Recommendation of the Disciplinary Review Board*

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey.

This matter is before the Board based upon a recommendation for public discipline filed by the District X Ethics Committee (DEC).

Joseph F. Flayer, the respondent herein, was admitted to the New Jersey bar in 1976. His office is located at 389 Route 46, Budd Lake, New Jersey. Respondent has no prior disciplinary history.

The charges against respondent stem from his conduct following a real estate closing in which he represented himself and his wife. As a result of the seller's failure to complete repairs on respondent's new home, as agreed, respondent used escrow funds to complete the repairs, without first obtaining specific authorization from the seller.

COUNT I

On April 22, 1987, Respondent and his wife entered into a contract for sale of real estate with Factory Built, Inc. Charles H. Schultz, the grievant herein, was one of the principals of the corporation. He was also the real estate broker involved with the sale of the property.

The closing of title for respondent's property, located in Long Valley, New Jersey, occurred on April 22, 1987. While respondent represented himself at the title closing, George Benson, Esq. was listed as the attorney for the mortgage closing, which

occurred several days thereafter. Benson, however, did not prepare any of the closing documents or participate in the closing. Howard Spear was the corporation's attorney at all times.

A settlement statement (Exhibit C–1) was executed at the April 22, 1987 closing. The statement showed, at line 507, that $500 was being escrowed for unfinished worklist items. Line 509 showed a $4000 escrow for franchise taxes that had been required by respondent's title insurance company. Respondent was to hold these escrow monies. While no escrow agreement was executed for the franchise taxes, the parties did sign a worklist and escrow agreement for unfinished work on the premises. Exhibit C–2. The escrow agreement provided that the items appearing therein

> shall be finished by the seller within thirty (30) days. To secure performance thereof, the sum of $500.00 will be held in the trust account of Joseph F.Flayer, ESQ. [sic] and *will be released* to seller *upon* its *substantial completion* of these unfinished work items. [emphasis supplied].

Significantly, the $500 amount had originally been entered on the agreement as $2000. From the evidence adduced at the DEC hearing, it appears that respondent agreed to reduce the amount to $500, knowing that the $4000 sum escrowed for the franchise taxes could be used for the repairs as well, inasmuch as the taxes apparently amounted to only $40 or $50. T154–157.[1] Respondent cross-examined Schultz in an attempt to demonstrate that the tax escrow had been established for more than just a tax deficiency. He was, however, prevented from establishing that the escrowed amount had been significantly disproportionate to the actual taxes. Respondent tried to establish the relevance of this information, by stating:

> What we have here is a suggestion here that the sole purpose of the $4,000 was to take care of the tax escrow when we have the testimony of Mr. Spear who says this thing couldn't possibly have been more than $40 or $50. You have the evidence before you that the initial punch list of April 22 or 24th of '87 had a $2,000 amount, which is negotiated back down to $500 and a total escrow of

---

[1] T denotes the transcript of the July 16, 1991 DEC hearing.

$4,500. I'm trying to lay the groundwork for the proposition that everybody understood that the repairs in this matter were so far under that there could be no other purpose than to have that type of amount agreed to [sic] would be to cover the repairs.

[T115–116]

Apparently, the DEC concluded that respondent had learned that the repairs would exceed the amount of the $500 escrow only after the escrow had already been established. T118. This interpretation, however, failed to take into consideration the statement of Allan Kesselhaut, an officer and shareholder of Factory Built, Inc., that the worklist repairs would exceed $500. Respondent had dealt primarily with Kesselhaut regarding repairs to be made on the property. In fact, Kesselhaut attended the April 1987 closing and his signature appeared on the worklist and escrow agreement. T84. Kesselhaut testified at the DEC hearing that the fifty-three items on the worklist would probably have cost more than the $500 sum escrowed for repairs. T90. He stated, however, that, despite the fact that his name appeared on the escrow agreement, he did not recall who had negotiated the escrow amount. T85. At the Board hearing, when respondent was questioned why he had agreed to reduce the amount of the worklist escrow, he gave no explanation other than he had trusted Allan Kesselhaut.

Because the financial transactions occurred subsequent to the title closing, the escrow accounts were not established on April 22, 1987, but, instead, remained in one of respondent's accounts until April 30, 1987. On that date, respondent withdrew $4500 from one account and deposited it into his interest-bearing trust account at Crestmont Federal Savings, Budd Lake, New Jersey.

As of June 4, 1987, more than thirty days after the closing, the seller had completed some, but not all of the items on the April 22, 1987 worklist. On June 4, 1987, respondent sent Kesselhaut a post-closing worklist showing items that had not yet been completed, together with new items that had arisen since the closing. Exhibit C–6. Respondent requested that the

seller notify him of his intentions regarding the outstanding items.

By letter dated July 10, 1987 to Kesselhaut, respondent again notified the seller that the items on the post-closing worklist still had not been remedied. Moreover, one of the company's carpenters had caused more damage to the property, which was of great inconvenience to respondent. Respondent's letter stated:

> Because of these developments, I now require from you a time table as to when these items will be corrected. Additionally, I expect all of these items to be corrected before July 31, 1987. Unless you have some explanation as to why it cannot be done on a particular item, I think my request is more that reasonable considering the eleven weeks that have transpired without those major items being done. Should I not have your time table in my hands within the next seven (7) days, this is your further advice that *I will arrange to have these items accomplished at your expense.* While I do not care to put this into an adversarial relationship, your actions to date are giving me no choice. It is time for you to recognize that this work is going to be done for Joe, NOW! Otherwise, I think you will be surely displeased as to how it turns out for you. I just cannot be in the position of calling, writing to you, sending you worklists and having nothing meaningful accomplished and with further damage being done.[2] [emphasis supplied].

[Exhibit C–7]

Respondent also provided the company's attorney, Howard Spear, with a copy of the letter. On July 14, 1987, the date Kesselhaut received respondent's letter, the two had a telephone conversation, wherein respondent reiterated the fact that he would be using "Kesselhaut's money" if the repairs were not completed. T146. Kesselhaut agreed to look into the matter and get back to respondent. T146–147.

As a result of the telephone conversation, apparently there were minor repairs made to respondent's ceiling. However, neither Kesselhaut nor Spear provided respondent with a time-

---

[2]At the time of this letter and of respondent's subsequent letters, it appears that he believed that Kesselhaut was the only principal of Factory Built, Inc. One must, therefore, assume that any references to Kesselhaut were to his corporate capacity.

table of repairs, either within seven days, as requested, or at anytime thereafter.

Subsequently, when the additional repairs were not undertaken by the seller, respondent obtained outside assistance to perform the work on his property, as he had cautioned in his letter. The work was performed on or about August 8, 1987 and August 30, 1987. Exhibit C–9. On September 9, 1987, respondent forwarded a post-closing worklist to Kesselhaut, showing which items had been completed from the list and the expenses that had been incurred, in the amount of $2400.

After receiving notice of respondent's actions, the seller failed to object to his conduct or to instruct him to cease making repairs on the property. Additionally, Schultz went to respondent's home in the fall of 1987 to discuss the pending problems. During that meeting, respondent, who did not yet know that Schultz was an officer of the corporation, advised him that he was using "Kesselhaut's money" to make the repairs. T143. This fact was reiterated in respondent's October 7, 1987 letter to Schultz:

> I am enclosing copies of correspondence I provided to Alen [sic] Kesselhaut on July 10, 1987 as well as the Post Closing Worklist of September 9, 1987. As you indicated to me you had a financial interest in that company and were concerned about my satisfaction with the work that had been done, I thought that you would be interested in seeing that, in fact, Mr. Kesselhaut has not done anything since July 10, 1987 other than have 7 holes in my ceiling repaired where the plumber had to break through to strap heating system pipes. Mr. Kesselhaut neither provided to me any arguments as to any of these items on the worklist, nor did he provide me with any time table or attempt to accomplish anything, so *I have been in the process of doing this work myself, at his expense.* As you can see from the September 9, 1987 list, this is getting to be an expensive proposition. *I still have several major items yet to be done and they are being scheduled.* Because I am not able to purchase these services at wholesale, but must pay retail prices for this construction *you can assume that the prices therefore will be high for the remaining items.* Additionally, *there will be added on a 25% charge for my services in arranging all of this work and providing supervision thereto.* [emphasis supplied].

[Exhibit C–11]

Schultz neither replied to respondent's letter nor objected to its contents.

Respondent made withdrawals against the escrow account on August 10, 1987, for $1500; on October 15, 1987, for $1,687.50; and on August 12, 1988, for the final escrow proceeds of $1,312.50. Respondent testified that, during this time, he had made the repairs that the company had failed to complete. Much of the work was completed by him, with the assistance of his brother and other family members. T137. Because he believed that the seller had abandoned the property, he did not maintain accounts of expenses or records of the time expended on the projects. Respondent's only invoices were those provided by Dig We Will, Inc. on August 8, 1987 and August 30, 1987, in the total amount of $2400.

Apparently, there was no further communication from either the seller or its attorney with respondent, until early November 1989. On November 16, 1989, two and one-half years after the closing, Spear forwarded a letter to George Benson, seeking a refund of the $4000 escrow for his client. He enclosed with his letter a copy of a certificate issued on October 31, 1989, showing that there were no delinquent franchise taxes as of January 1, 1989 and, therefore, no lien against the property. Exhibit C–15.

Approximately two weeks earlier, during a conversation with Spear, respondent testified that he had notified Spear that the escrow monies had been spent on repairs. T142. Spear, in turn, testified that respondent did not advise him that the escrow money had been expended in full. Respondent forwarded an ambiguous letter dated November 27, 1989 to Spear (Exhibit C–16), wherein he stated with regard to Spear's November 16, 1989 letter: "its content amazes me as you will recall our telephone conversation just two weeks prior wherein I related to you the position taken by the buyer as to repairs versus your escrow claims, now nearly three years old." Respondent noted therein his earlier correspondence to Kesselhaut, Schultz and Spear, as well as the fact that there were still outstanding repairs. Respondent concluded the letter by saying "[w]hen your client is in a position to respond to my

demands for repairs I will entertain its demands concerning alleged escrows." Respondent contended at hearing that the comment meant that he "was alluding to the fact that [the escrows] no longer existed." T142.

Respondent further testified that the language that he was making repairs "at his expense" was intended to mean that the repairs were being done out of escrow funds. T150. He conceded that it would have been better "if I had said I'm taking this out of the escrow account, but I didn't. I didn't think it was necessary to do [sic]." *Id.* Respondent believed that he had given the company full notice of what he intended to do with the escrow monies and that, by virtue of their inaction and silence, he had the right to proceed as he had indicated. T153. Had anyone objected, he would have "paid the entire $4,500 into court and started a suit...." T155. Respondent admitted that, while he could have made the notices a little clearer, under the circumstances, he believed that all involved were aware of what was going on. T165.

The following is a summary of the transfer of the escrow funds following the July 10, 1987 letter to Kesselhaut, indicating that the repairs would be accomplished at "Kesselhaut's expense":

(1) On August 10, 1987, respondent withdrew $1500 from his attorney trust account by check 1001 payable to himself. He deposited the money to the account of Mount Olive Realty Associates, a separate business wholly owned by respondent. The Mount Olive Realty Associates account was maintained at Horizon Bank, Morristown, New Jersey. Respondent did not give any specific notice to the seller or the seller's attorney, either orally or in writing, of this escrow withdrawal. The withdrawal exhausted the funds set aside for "unfinished work list items" and, in fact, exceeded the "work list escrow" reserve by $1000. The sum invaded the monies escrowed to satisfy the seller's franchise tax obligations.

(2) On the same date, August 10, 1987, respondent issued a check for $1,500 on the Mount Olive Realty Associates account, payable to Dig We Will, Inc. The check was to satisfy two invoices, dated August 8, 1987, totalling $1500 for driveway grading and site excavation work on his property. Exhibit C–9.

(3) As noted above, on September 9, 1987, respondent notified the seller that there were items of work that remained incomplete and provided a list to the seller indicating that some of the items had been completed by "JFF," the respondent. While the letter set forth the expenses incurred by respondent to do the work, it did not make specific reference to the source of funds used to finance the work or actually state that any of the escrow funds had been utilized for that purpose.

(4) On October 15, 1987, respondent issued a check from his attorney trust account payable to himself in the amount of $1,687.50. Respondent endorsed that check and deposited the funds to his Mount Olive Realty Associates business account. Although respondent testified that the funds were used for uncompleted work and repairs on his residence, no specific corresponding proofs were offered.

(5) On October 15, 1987, respondent issued a check from his Mount Olive Realty Associates account in the amount of $900 payable to Dig We Will, Inc., apparently to pay for an August 30, 1987 invoice for "regrading and restone" work.

(6) On August 12, 1988, respondent withdrew $1,312.50 from his attorney trust account payable to himself. Respondent testified that the money corresponded to repairs for work completed at his residence that should have been completed by seller. Respondent did not give any notice to the seller of the withdrawal. This withdrawal exhausted the entire escrow amounts both for incomplete work and for the seller's tax obligations. Respondent did not produce any records before or at the DEC hearing to show where the money was deposited after it was withdrawn.

As of the date of the DEC hearing, no portion of the $4000 escrow had been returned to seller. Spear testified that he was not aware, as of July 10, 1987, of any intention of respondent to utilize funds escrowed for repairs and franchise tax lien purposes.

Allan Kesselhaut is the individual who had most of the relevant dealings with respondent regarding repairs, both prior to and after the closing. By October 7, 1987, Kesselhaut was no longer associated with the seller. Kesselhaut recalled receiving respondent's July 10, 1987 letter, but testified that he did not interpret any statement contained therein as an indication that respondent would utilize the escrow funds, if not satisfied with the post-closing repair work. He was not, however, questioned with regard to his understanding of the contents of the July 1987 letter.

Charles Schultz was not involved in the negotiations with respondent and his wife or with the closing. He testified that in late 1989, he learned from Spear that an escrow had been overlooked from the 1987 closing. He claimed that, between April and September 1987, he had no conversations with respondent regarding respondent's worklist. Schultz believed that, as of December 1987, all of respondent's requested repairs had been undertaken. He had apparently obtained this information from his son, who had been involved with the seller's construction activities.

Schultz testified that he had not had conversations with respondent regarding any use of the escrow funds. Schultz never authorized respondent to use the franchise tax escrow for repair work to the residence. He did not recall a conversation with respondent in the fall of 1987 where respondent stated, "I'm using Allan [Kesselhaut's] money" to do repairs.

Respondent admitted having made all of the withdrawals of escrow funds under his control. Apart from the three invoices totaling $2400 from Dig We Will, Inc., respondent presented no documentary evidence to substantiate his expenditures for re-

pairs to the premises. Instead, respondent offered oral testimony as to numerous repairs that he had made to the property and grounds after he had sent the July 1987 notice to Kesselhaut. Respondent testified that many of the repairs that he deemed necessary were repairs that he performed himself and assessed to the seller at a rate of $25 per hour for his own time. He hired a tractor operator for a tractor and a "york rake" to spread gravel and stone at a cost of $250, which he paid from his own funds. He also claimed to charge the seller for the "fair rental value" of heavy equipment used, although he owned the equipment himself (a John Deere tractor/rake machine).

Respondent admitted that he had withdrawn all escrow funds from his attorney trust account. He did not produce the account or business records from Mount Olive Realty Associates and objected to their production, claiming that they were irrelevant.

Respondent testified that he considered his July 10, 1987 letter as notice to seller that he intended to withdraw the trust funds if the seller did not complete the requested work. He admitted, however, that his letter did not make any specific references to such intent. He also conceded that he received no direct or express authorization from the seller to withdraw the funds, but interpreted the seller's silence in the face of his demands as tacit authorization to utilize the escrow funds. While respondent admitted that the $4000 amount was originally escrowed for franchise tax purposes, he claimed that his July 10, 1987 letter constituted a proposal to change the purpose of the escrows, which the seller accepted through its silence. Respondent testified that, by his own calculations, he expended approximately $4970 to complete the requested repairs and work.

As the result of the foregoing, the DEC found that respondent's arguments were made to rationalize his actions. According to the DEC, his argument appeared to have been that the

seller should have "read between the lines," when, in fact, respondent never gave notice of the actual withdrawals or even of any intent to invade the escrow funds. Finally, his defense, based as it was on the seller's failure to complete work, did not justify the use of escrow monies.

The DEC found clear and convincing evidence that respondent had violated *RPC* 1.15(a), (b) and (c).

COUNT II

On February 12, 1990 and March 5, 1990, the DEC investigator made requests for information and for a response in connection with the instant grievance. Additional information was requested from respondent on April 26, 1990.

On July 6 and 23, 1990, additional requests for information and records, including bank records, canceled checks and invoices for repairs and work, were made of respondent. A follow-up request for information was sent to respondent on August 9, 1990.

By letter of August 22, 1990, respondent provided copies of two Mount Olive Realty Associates checks and three contractor invoices, in response to the investigator's demand for information and documents. Respondent had also provided copies of his trust account ledger cards. Exhibit C–3 and C–4.

Despite demands for information from the investigator, however, respondent did not produce supporting documentation for specific expenditures of escrow funds. Respondent's testimony that he and his family made most of the repairs explains the lack of most of the documentation. Throughout the hearing, respondent maintained his objections to the production of records from Mount Oliver Realty Associates. He claimed that the records of his separately-owned business entity, to which a substantial portion of the escrow funds were transferred, were not relevant to the matter.

Based on the foregoing, the DEC found clear and convincing evidence that respondent violated *RPC* 8.1(b).

## CONCLUSION AND RECOMMENDATION

Upon a *de novo* review of the full record, the Board is satisfied that the DEC's findings of unethical conduct are supported by clear and convincing evidence. At the closing, an escrow fund was created to insure the completion of various work items on respondent's premises and to insure that franchise taxes owed by the corporation were paid. Interestingly, neither of the corporation's principals took responsibility for negotiating the $500 repair escrow. Moreover, neither of the principals assumed responsibility for completing the repairs on the premises, which they had promised to accomplish within thirty days of the closing. As of the date of the DEC hearing, four years after the closing, it appeared that there were still outstanding repairs on the premises, notwithstanding the seller's promise to complete all needed repairs within thirty days of closing.

There is no question that respondent's conduct was technically improper. However, in light of the attendant circumstances, his actions are understandable. Following the closing, respondent waited thirty days prior to notifying the seller that worklist repairs were still outstanding and additional problems had come to light as the result of faulty workmanship. More than a month later, in July 1987, respondent again notified the seller that the repairs had not been made and that he wanted a timetable for the repairs within seven days or he would accomplish the work at the seller's expense. A copy of the letter was also sent to seller's attorney.[3] What possible interpretation could the seller or its attorney have made, knowing that money was being held in escrow by respondent? There is no question that both the attorney and the seller received the letter; yet neither one of them contacted respondent to provide a timeta-

---

[3] At the DEC hearing, Spear cavalierly admitted that, in May or June 1987, respondent had contacted him regarding the open worklist items. He testified "and I, in turn, would follow it up with my client. However, somehow or another it never got resolved." T41.

ble, to schedule repairs, to object to respondent's terms or even to ascertain the meaning of "at your expense."

Approximately thirty days later, absent any response from the seller or its attorney, respondent hired Dig We Will, Inc., which provided $2400 worth of services to respondent. On September 9, 1987, respondent forwarded to seller a copy of the costs that had been incurred, but again received no reply, no comment, nothing to indicate that the work being done "at your expense" was unacceptable.

> Later, on October 7, 1987, respondent notified Schultz that Kesselhaut neither provided me with any arguments as to any of these items on the worklist, nor did he provide me with any time table or attempt to accomplish anything, so I have been in the process of doing this work myself, at his expense.... assume that the prices therefore will be high for the remaining items. Additionally there will be added on a 25% for my services....

### [Exhibit C–11]

Respondent enclosed copies of his expenses up to that time. Respondent received no reply from the seller or questions regarding how the expenses were being paid. The seller made no effort to complete the outstanding repairs. In fact, the seller took no action at all.

Respondent testified that he felt abandoned—understandably so. There were repairs to be done in his home, some of which were major; yet, the responsible entity failed to satisfy its obligations. Respondent took matters into his own hands and completed much of the work himself, using the escrow monies. He acknowledged that a court action would have been warranted, had he been met with some resistance. But he interpreted the seller's silence and its attorney's silence as tacit assent to his conduct.

It is unquestionable that respondent's conduct was technically improper. His letters should have clearly specified that he would be depleting the escrow funds to accomplish the repairs. Alternatively, he should have instituted court action, even an emergent action, such as one by means of an order to show

cause. Although his misconduct cannot be condoned, it is, however, understandable, in the face of the seller's breach of promise and ensuing silence.

This situation is unique, in that respondent's actions were taken in his own behalf, rather than for a client. Accordingly, his conduct should have been beyond reproach to avoid any actual or perceived wrongdoing. As the attorney charged with maintaining the escrow account, he had a fiduciary duty to maintain meticulous records of expenses and of time spent making repairs. In fact, respondent candidly admitted that he would have handled the matter differently, had he represented a client, instead of himself. He acknowledged that the notice to the seller should have specifically advised it of his intentions to use the escrow funds, rather than merely state that he would be "accomplishing the repairs at [Kesselhaut's] expense." Moreover, had he been dealing with an actual client, he would not have disbursed any escrow funds without first obtaining specific authorization from the seller. All disbursements from the account would, accordingly, have required proper documentation. Respondent also recognized that the appropriate redress for the seller's silence was to institute court action. He acknowledged the propriety of that remedy and, in fact, had there been an actual client involved, he admitted that he would have taken the matter to court.

Respondent's conduct herein exemplifies the improper commingling of an attorney's legal and personal interests. His actions illustrate the old adage that "a lawyer who represents himself has a fool for a client." Respondent admitted that he was trying to take a shortcut, a shortcut that in the end, entangled him in the web of the ethics system for more than two years.

This matter clearly underscores the problems associated with acting as one's own escrow agent, particularly in an emotionally charged situation. Respondent's frustration with the seller's inaction was too easily overcome by dipping into the escrow

funds. The bar must take heed of the dangers surrounding such situations.

Finally, the absence of sufficient documentation in this matter is irrelevant to respondent's lack of cooperation with the DEC investigator. Respondent had an affirmative obligation to explain to the DEC the reason for the lack of documentation. Nevertheless, had respondent provided the requested information and been able to substantiate his disbursements, it might only have served to mitigate his offense. In light of this and respondent's release of escrow funds without proper authorization, it is clear that he must be sanctioned for his conduct.

Although respondent's frustration with an unresponsive seller and seller's counsel is understandable, his conduct was nevertheless inappropriate. The DEC, therefore, properly concluded that respondent's conduct was a violation of *RPC* 1.15(a), (b) and (c). His actions, however, did not rise to the level of the knowing misuse described in *In re Hollendonner*, 102 *N.J.* 21, 504 *A.*2d 1174 (1985). In *Hollendonner*, the attorney failed to fully explain the duties of an escrowee to his client and then failed to obtain permission from the second party to the escrow agreement to have the funds released. The attorney relied solely upon his client's permission to take the money. The attorney was spared disbarment because 1.) there was no clear and convincing evidence that he had invaded the escrow funds with knowledge that the use of those funds was improper; and 2.) it was the Court's first occasion to "address the near identity of escrow funds and trust funds." *Id.* at 29, 504 *A.*2d 1174. The attorney received a one-year suspension. Respondent's conduct herein is distinguishable, in that he attempted to obtain the cooperation of the seller prior to using the escrow funds. Upon failing to receive its cooperation, he put the seller on notice, albeit in an inadequate fashion, that he intended to use the escrow funds. Additionally, respondent was his own client. While his notice to the seller was not entirely clear, neither the seller nor its attorney pursued the

matter. The significant passage of time from closing to the time that the attorney attempted to recover the escrow funds certainly justified respondent's feelings of having been abandoned.

Respondent's conduct herein is more akin to situations where private reprimands have been imposed. For instance, in a matter decided on August 20, 1991, also a case involving a real estate transaction, an attorney released the balance of escrow funds to his client, where he was unable to obtain bills from two of his client's creditors. He released the funds with the understanding that his clients would be responsible for paying those bills directly. The attorney, however, failed to obtain the consent of the other party to the escrow agreement prior to releasing the monies.

In yet another real estate matter, an attorney improperly disbursed trust funds without authorization, consent or approval from the seller or his attorney. The Board, in imposing a private reprimand, considered that the attorney honestly believed that his client was entitled to the monies and that the attorney had taken appropriate steps to ensure that the grievant had been made whole. That matter was decided on June 27, 1988.

Based on the foregoing and on the fact that respondent has an unblemished record, a majority of the Board recommends that respondent receive a public reprimand. Two members dissented, voting for a three-month suspension based primarily upon respondent's failure to substantiate his expenditures with documentary evidence. One member did not participate.

The Board further recommends that respondent be required to reimburse the Ethics Financial Committee for administrative costs.

Dated: 3/12/92