575 A.2d 1355

IN THE MATTER OF NORMAN J. CHIDIAC, AN
ATTORNEY AT LAW.

Argued May 21, 1990—Decided June 29, 1990.

*Richard J. Engelhardt,* Assistant Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Allan M. Harris* argued the cause for respondent (*Ravin, Greenberg & Zackin,* attorneys).

PER CURIAM.

This is an attorney-disciplinary case in which the Disciplinary Review Board (DRB or Board) found that respondent, Norman J. Chidiac, had engaged in unethical conduct warranting public discipline. The ethics violations consisted of a breach of the standards of the *Rules of Professional Conduct* 1.4 and 1.15.

The discipline recommended was a suspension from the practice of law for three years.

## I.

The charges relate to respondent's representation of Cathedral Housing Corporation (Cathedral Housing), a charitable organization affiliated with the Diocese of Paterson. Cathedral Housing was incorporated in 1973 for the purpose of rehabilitating houses for low-income families. An initial trustee and director of the corporation, Father W., a Catholic Priest, actively engaged in all of the activities of the corporation on a daily basis for seven years. He personally bought, renovated, sold, and rented houses for Cathedral Housing.

Respondent began to represent Cathedral Housing in 1974. Between 1974 and 1980, respondent participated in several real-estate closings for Cathedral Housing. During that time, respondent also represented Cathedral Housing in several other matters, including a contractor's claim, a workers' compensation claim, the drafting of a state grant application, tenant evictions, preparation of rental leases, and preparation of a sub-division application. In addition, respondent conferred with Father W. on a regular basis.

During that time, respondent never received compensation for his legal services. He testified that because it was not generating sufficient income, Cathedral Housing could not afford his legal fees, but that he decided he wanted to continue to help Cathedral Housing. He therefore worked without reimbursement. That was consistent with evidence demonstrating that respondent did an enormous amount of pro-bono legal work for indigents.

In January 1980, when Father W. left Cathedral Housing for another position, he asked respondent to manage Cathedral Housing's properties. Father W. testified that he had instructed respondent to collect rents, pay taxes, arrange for repairs and, if possible, sell those properties. He also indicated to

respondent that "the Diocese doesn't seem to be interested in this thing at all," and that he should "[t]ry to manage the properties and manage them as you would your own." Father W. testified that respondent was to take whatever legal fees were appropriate, including fees for earlier legal services, and turn any surplus funds over to the Diocese. Respondent's testimony differed somewhat in that he recalled Father W. asking him to manage the properties only until Father W. came back to resume the work, which, it was anticipated, would be after several years. Respondent also understood that he was to keep *all* surplus funds after managing and selling Cathedral properties for his past legal fees and present management fees.

Respondent kept no records on either income received or expenses paid on behalf of Cathedral Housing. During that time respondent personally owned five buildings consisting of a total of thirty rental units. Respondent apparently managed Cathedral Housing property as though he were managing his own properties. He deposited all rent and mortgage payments into one checking account for both his own properties and the Cathedral Housing property, and he paid all expenses from the same checking account. The only records he maintained were checks, deposit slips, and bank statements, with no records of expenses or income for any of the rental units. During that period, respondent did not pay the taxes on either his own property or the property owned by Cathedral Housing.

No specific Cathedral Housing deposits could be identified in respondent's attorney trust account. It is clear that respondent did not deposit Cathedral Housing funds into his attorney trust account. Although respondent prepared the legal documents necessary for several tenant evictions and for a real estate closing on behalf of Cathedral Housing, he claimed that no moneys were placed in his attorney trust account "because I wasn't working as an attorney. In my mind I was working as a property manager. Never even occurred to me they should be deposited in any attorney trust account." Because respondent kept no rent records that would indicate which units were

producing income and which units were not, it was impossible to reconstruct the income and expenses generated by Cathedral Housing between 1980 and 1986. It was also impossible to determine the amount of income generated by Cathedral Housing properties during this period or to assess accurately the net funds generated from 1980 to 1986 after housing expenses, even without considering respondent's legal fees. Respondent testified that he had no idea what his exact Cathedral Housing legal fees from 1974 to 1980 should have been. Similarly, he did not know what surplus, if any, he had taken from Cathedral Housing between 1980 and 1986.

In 1985, the Diocese of Paterson communicated with respondent for the first time for an accounting. In May 1985, respondent gave the Diocese an estimated accounting for January 1, 1985, through March 31, 1986. Based on that incomplete estimate, the Diocese concluded that respondent owed it money. In February 1987, respondent settled with the Diocese by purchasing one of the Cathedral Housing properties for an amount greater than the property's estimated value and agreeing to pay the property's back taxes. Thus, respondent effectively reimbursed the Diocese for approximately $50,000. That settlement with the Diocese did not include any offset for respondent's fees for the period of 1974 through 1986. According to respondent, he settled because

> I figured it was the intelligent thing to do at this point since I really didn't feel that I owed any money and I just figured it was the thing to do because they were asserting a claim. I didn't want to have any additional problems. I had enough on my hands and mind at the time; couldn't cope with anymore.

## II.

Following a hearing in which the foregoing evidence was adduced, the District Ethics Committee found that respondent had violated *Rule of Professional Conduct* 1.4 (*RPC*) [*DR* 9–102(B)(2)] by not keeping his client reasonably informed. It further found that respondent had violated *RPC* 8.4 [*DR* 1–102(A)(4)] by engaging in conduct involving dishonesty, fraud,

deceit, or misrepresentation by retaining all the net proceeds for his own benefit without having told his client. Finally, the Committee found that respondent had violated *RPC* 1.15 [*DR* 9–102] by commingling his own personal funds with those of his client, by not accounting to his client for the funds received, and by not obtaining the consent of his client for the disbursement of those funds to himself. On a *de novo* review of the full record, the DRB determined that two of the conclusions of the Committee in finding respondent guilty of unethical conduct were supported by clear and convincing evidence: respondent had not communicated adequately with his client in violation of *RPC* 1.4; and he had failed to safekeep property in violation of *RPC* 1.15. The Board concluded, however, that the record did not support a finding of intentional deception or dishonesty by respondent in violation of *RPC* 8.4.

We have independently reviewed the record and find by clear and convincing evidence that the recommended findings of the Board have been established. In support of its determination the Board observed

> that respondent became Cathedral Housing's attorney in 1974 and continued in that role until 1986. In 1980, when respondent added managing the properties to his responsibilities, he did not have the right to lessen his accountability to his client. While it is true that Father W. knew respondent himself owned other property and allegedly had management skills, that does not obviate the fact that Father W.'s trust in respondent primarily rested in his previous experience with respondent as Cathedral Housing's attorney. This high regard for respondent as Cathedral Housing's attorney for many years is the reason why Father W. entrusted respondent with the care of the remaining properties.

The Board also concluded that as an attorney, respondent should have known that his professional responsibilities are not met simply by following a client's instructions that do not account for the unforeseeable or unexpected (citing *In re Wallace*, 104 *N.J.* 589, 593, 518 *A.*2d 740 (1986)). Thus, regardless of Father W.'s expectations and standards, respondent was bound by the professional ethics standards and, in accordance with *RPC* 1.15 and *Rule* 1:21–6, "part of [his] responsibility to the legal system is the maintenance and supervision of account-

ing records" (citing *In re Orlando,* 104 *N.J.* 344, 350, 517 *A.*2d 139 (1986)).

The DRB stressed that ethics standards exist to prevent not only the loss of funds caused by intentional misappropriation but also to prevent the losses caused by negligent or non-existent bookkeeping. Respondent, it found, had failed to keep required records and could not therefore inform his client even whether there was a surplus or a deficit in its account. The Board also stated:

[T]he Rules of Professional Conduct may apply even where the attorney is not directly involved in the practice of law. It is well settled that an attorney is "... obligated to adhere to the high standard of conduct required of a member of the bar even though his activities did not involve the practice of law." *In re Franklin,* 71 *N.J.* 425, 429 [365 *A.*2d 1361] (1976). If an attorney wishes to be a businessman as well as perform the precise functions of a lawyer, he must act in the transaction with the high standards of his profession. *In re Genser,* 15 *N.J.* 600, 606 [105 *A.*2d 829] (1959) [ (1954) ]. *See also In re Suchanoff,* 93 *N.J.* 226 [460 *A.*2d 642] (1983).... [E]ven assuming he was acting only as a property manager from 1980 on, he would still be held to the high standards expected of an attorney whenever client funds are involved.

The Board, as noted, rejected the Committee's finding of knowing misappropriation. We agree with that conclusion. Moreover, the underlying facts that support that result are germane in determining the appropriate discipline. The Board reasoned as follows:

While this record clearly evidences flagrant record keeping violations, a finding of knowing misappropriation cannot be sustained by clear and convincing evidence. Misappropriation is "any unauthorized use by the lawyer of client's finds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derived any personal gain or benefit therefrom." *In re Wilson,* 81 *N.J.* 451, 455 n. 1 [409 *A.*2d 1153] (1979). The misappropriation that will trigger automatic disbarment "consists simply of a lawyer taking a client's money entrusted to him, knowing that client has not authorized the taking." *In re Noonan,* 102 *N.J.* 157, 159 [506 *A.*2d 722] (1986).

Testimony was elicited concerning the circumstances surrounding respondent's handling of Cathedral Housing Corporation. Before respondent attended law school, he was employed as a social worker from 1961 to 1966. When respondent opened his law office he continued to work for this same population: his clients consisted of many disadvantaged individuals, half of whom he estimated he represented free of charge. The letter from the Executive Director of the Passaic County Legal Aid Society stated the following:

The entourage of people to his [respondent's] office, including many repeat clients, compels me to wonder at times as to whether or not there were actually two Legal Aid offices in our building.

What I am saying is that Norman Chidiac is a special kind of individual who cares for and takes care of many people who would not easily obtain legal services in the City of Paterson. My experiences with him compel me to conclude that he is honest, trustworthy and without any kind of larcenous intent as to anyone.

Testimony by attorneys and clients indicates respondent provided a large volume of pro-bono legal services. Respondent's psychiatrist, who testified after seeing respondent eight times, found respondent combined his earlier training as a social worker with his legal training, sometimes to a disadvantage. Respondent would neglect his professional responsibility to maintain proper documentation in order to respond quickly to his needy clients. The psychiatrist did not find any psychological deficiencies on respondent's part: he was sure that respondent could learn to manage his practice more efficiently.

Further, during the period of 1981 through 1986, respondent experienced marital difficulties. In 1981, respondent's older sister came to live with his family for four years, while her own home was being renovated. This additional household member did not get along with respondent's wife. The resulting conflict between respondent and his wife contributed to their separation in 1984, followed by divorce in 1988.

Influenced in large measure by those facts, the Board was convinced respondent had a good faith belief that his taking of funds was authorized by his client. Father W.'s testimony that he told respondent to take his fees, as well as respondent's philanthropic approach to law in general, provide evidence in support of respondent's belief that his taking of funds was authorized. Furthermore, there was no evidence that respondent designed a system to prevent himself from knowing whether he was using client funds. In re Fleisher [Fleischer], 102 N.J. 440 [508 A.2d 1115] (1986). This conclusion is supported by the fact that respondent was facing foreclosure on his own property for failure to pay property taxes, and his recordkeeping for his own investments was as poor as that for his client.

### III.

We concur in the findings and recommended determination of the Board. We note that respondent was admitted to the New Jersey bar in 1970 and engaged in the practice of law in Paterson, New Jersey until December 14, 1987. On that date, based on a breach of ethics, he was suspended, pending resolution of the instant matter. In re Chidiac, 109 N.J. 84, 533 A.2d 704 (1987). The ethics violations that were the basis of that discipline consisted of the filing of an inheritance-tax return

bearing a forged signature. Here, respondent's misdeeds arose out of neglect and inattentiveness, not venality or greed. Nevertheless, respondent's misconduct in this case is serious and warrants severe discipline. We determine that respondent be suspended from the practice of law for three years, retroactive from the date of our earlier order, 109 *N.J.* 84, 533 *A.*2d 704, imposing an indefinite suspension.

Respondent shall reimburse the Ethics Financial Committee for administrative costs.

So ordered.

*For suspension*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —None.

## ORDER

It is ORDERED that NORMAN J. CHIDIAC of PATERSON, who was admitted to the bar of this State in 1970, is suspended from the practice of law for three years and until further order of this Court, the suspension retroactive from December 14, 1987; and it is further

ORDERED that NORMAN J. CHIDIAC reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that NORMAN J. CHIDIAC continue to be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that NORMAN J. CHIDIAC comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended attorneys.