665 A.2d 1094

IN THE MATTER OF LOUIS R. DILIETO,
AN ATTORNEY AT LAW.

Argued June 20, 1995—Decided October 6, 1995.

*John J. Janasie,* First Assistant Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*William J. Gearty* argued the cause for respondent.

PER CURIAM.

Respondent Louis R. DiLieto was admitted to practice law in New Jersey in 1965. He maintained a law office in Asbury Park, New Jersey, during the time relevant to these proceedings.

Respondent's problems first came to the attention of the Office of Attorney Ethics (OAE) following a random compliance audit conducted pursuant to *Rule* 1:21–6(c). As a result of the findings of that audit, a demand audit was conducted thereafter. The audits covered the period between April 1, 1987, and March 31, 1989. The audits disclosed, among other things, that for a number of years there had been no reconciliation of respondent's trust account bank statements with a schedule of client balances, and that respondent had been out of trust numerous times during 1987. Irregularities were also uncovered in real estate transactions involving Elizabeth Herrera, Martin J. Walsh, Kenneth Lombardi, Timothy Cassidy and Edward Siwakowski.

The District XIV Ethics Committee (DEC) charged that respondent 1) borrowed his client's trust funds without her knowledge and approval and without advising the client to seek independent counsel, 2) knowingly misappropriated trust funds and failed to safeguard trust funds in which his clients and others may have had an interest, and 3) made personal use of his client's trust funds without the client's knowledge or approval and without advising the client to seek advice from independent counsel. The complaint alleged that respondent's misconduct violated *RPC* 1.1, 1.8, 1.15, 8.4(c) and the principles announced in *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979) and *In re Hollendonner*, 102 *N.J.* 21, 504 *A.*2d 1174 (1985).

A Special Master recommended public discipline for three knowing misappropriations of trust funds, a conflict of interest, and numerous record-keeping violations, especially with respect to respondent's trust account. A four-member majority of the Disciplinary Review Board (DRB) held that respondent had not knowingly misappropriated trust funds and recommended a six-month suspension for record-keeping violations. Three members of the DRB found that respondent had knowingly misappropriated escrow funds and recommended disbarment based on the *Lombardi–Cassidy* matter.

## I

■ The Herrera matter involved a charge that respondent knowingly misappropriated a client's funds by failing to disclose to the client that he, rather than a third party, was to be the borrower of the funds.

We agree with and adopt the factual findings and conclusions of the DRB in the Herrera matter:

Respondent had represented Helen Frangione, Elizabeth Herrera's sister, for many years. When she died, Mrs. Herrera, who lived in Venezuela, became the sole beneficiary of her estate. One asset of the estate was Mrs. Frangione's house in Ocean Grove, which was sold after her death. As a result of respondent's representation of Mrs. Herrera in the estate matter, he came into possession of $55,000, the net proceeds from the sale of the Ocean Grove house.

Respondent testified that Mrs. Herrera did not want the funds sent to Venezuela because of the unfavorable political climate in that country. She wanted to keep the monies in New Jersey. When respondent asked her if she would like to lend them out, Mrs. Herrera replied affirmatively. Respondent then borrowed the $55,000 himself at a ten percent interest rate.

According to the complaint, respondent never disclosed to Mrs. Herrera that he was the borrower, a contention respondent denies. He testified that Mrs. Herrera was aware, from the beginning, that the loan was for himself. Respondent added that he had given Mrs. Herrera the original of a mortgage note, of which he did not keep a copy. At the DEC hearing, however, respondent conceded that the note was actually a promissory note, with no mortgage or other security for the loan.

It is undisputed that respondent fully repaid the loan on April 30, 1987. In addition, Exhibit P–1 shows that respondent paid $16,000 in interest on the loan. At the DEC hearing, Paula Granuzzo, Esq., a former deputy ethics counsel with the OAE, and Kenneth Tulloch, an investigative auditor with that office, testified that, during one of their several visits to respondent's office, respondent admitted that he had borrowed the monies from Mrs. Herrera without revealing to her that he was the borrower. Respondent denies having made such statements, although he conceded that he had not advised Mrs. Herrera to seek the advice of independent counsel at the time of the loan.

Mrs. Herrera did not testify.

\*        \*        \*        \*        \*        \*        \*        \*

The Special Master concluded that, without Mrs. Herrera's testimony, there was no clear and convincing evidence that respondent had not disclosed to her that the loan was for himself. The Special Master remarked that "[t]he evidence of misappropriation is very strong and, if the standard of proof was a preponderance of the evidence, this burden would be met in this Hearing Officer's determination. However, the evidence falls just short of being clear and convincing on this issue."

The Special Master found, however, that respondent violated *RPC* 1.8(a), when he failed to advise Mrs. Herrera to seek independent legal counsel.

We also find that a knowing misappropriation of the Herrera funds has not been established by clear and convincing evidence. Although we harbor serious reservations respecting respondent's credibility, the failure of Ms. Herrera to testify convinces us that the high standard of proof has not been met.

## II

Respondent was also charged with knowing misappropriation of Siwakowski funds by investing client funds without disclosing to the client that respondent was the borrower.

We agree with and adopt the factual findings made by the Special Master that were adopted essentially by the DRB:

During his practice of law, Mr. DiLieto represented Edward Siwakowski in the sale of property to Sherry Sciarappa on or about August 7, 1986, wherein Mr. Siwakowski took back a Mortgage from Ms. Sciarappa, and the subsequent pay-off by Ms. Sciarappa of said Mortgage. Ms. Sciarappa paid off the Mortgage with Attorney Trust Account check #2749 of Resnikoff & Resnikoff, dated November 20, 1987, payable to Edward and Margaret Siwakowski for $38,921.68. This pay-off check was deposited in Mr. DiLieto's Trust Account on November 30, 1987. At some point, either shortly before or after the Mortgage was paid off, Mr. DiLieto and his client, Mr. Siwakowski, discussed investing Mr. Siwakowski's money. Mr. DiLieto told Mr. Siwakowski that he had a borrower who would pay 12 percent interest, an that he, Mr. DiLieto, would personally "guarantee" the loan. Mr. DiLieto further acknowledged that he did not initially inform Mr. Siwakowski that he, Mr. DiLieto, was the borrower. Mr. DiLieto, at some point, in response to Mr. Siwakowski's questions, told him that he, Mr. DiLieto, was the borrower. Mr. DiLieto has acknowledged that he never advised Mr. Siwakowski that he could seek legal advice from another attorney about making the loan to Mr. DiLieto.

At the hearing, Mr. DiLieto testified that there was a distant family relationship between him and Mr. Siwakowski and that he had known Mr. and Mrs. Siwakowski since approximately 1959. He advised Mr. Siwakowski on or about September 1987 that Ms. Sciarappa was selling the property and the Mortgage would, therefore, be paid and satisfied in full at that time. He indicates that he discussed with Mr. Siwakowski what to do with the money. Mr. Siwakowski did not want to invest the money in a Certificate of Deposit as this would "tie up the money." He requested that Mr. DiLieto lend out the money after Mr. DiLieto told him that he could get a 12 percent interest return on principal "and I will guarantee the Note." Mr. DiLieto further stated that originally he was going to lend the money to a client but that this "didn't pan out." According to Mr. DiLieto's Trust Account

ledger card, the Sciarappa money was deposited in his Trust Account on November 28, 1987 and on the same date the card shows that he drew a check to himself in sum of $30,500.00. Mr. DiLieto also testified that Mr. Siwakowski wanted $2,500.00 immediately from the Mortgage proceeds and that, accordingly, Mr. DiLieto drew a check to Mr. Siwakowski on said date. However, Mr. Siwakowski never came into the office to pick up the check and, therefore, Mr. DiLieto signed Mr. Siwakowski's name on the back of the check and cashed same. Finally, in mid December 1987, Mr. Siwakowski came into the office and Mr. DiLieto drew check # 6097 payable to Mr. Siwakowski in the sum of $3,000.00. Mr. DiLieto admitted that he did not advise Mr. Siwakowski that he, Mr. DiLieto, was the actual borrower of the funds, until April of 1988. He states that he gave Mr. Siwakowski a Note, "a guarantee", which Mr. Siwakowski folded and put in his wallet. He further acknowledges that he provided no security for the loan and did not advise Mr. Siwakowski to consult with independent counsel.

Curiously, Mr. [Kenneth] Tulloch [Investigative Auditor for OAE] testified that upon reviewing Mr. DiLieto's Siwakowski file, he found the *original* Promissory Note. He further testified that Mr. DiLieto advised him on February 8, 1990, that he, Mr. DiLieto, issued the Promissory Note "when Mr. Siwakowski began asking questions as to who the money was loaned to." Mr. Tulloch further testified that at another visit to Mr. DiLieto's office on June 9, 1992, Mr. DiLieto advised him that the Promissory Note was given to Mr. Siwakowski in the spring of 1988 and that he had not told Mr. Siwakowski earlier that, he, Mr. DiLieto was the actual borrower because he was too embarrassed to admit this to him in November of 1987.

Mr. Siwakowski testified at the hearing; however, his testimony was fraught with confusion and memory lapses. He did state, quite emphatically, that he never received a Promissory Note from Mr. DiLieto. It is noted that Mr. Siwakowski advised Mr. Tulloch in July of 1992 that he had requested for two years from November or December of 1987 to have Mr. DiLieto provide some documentation evidencing the loan; however, he was unable to obtain said documentation until the OAE began its audit of Mr. DiLieto's records. It does appear that the "loan" was repaid in full [with interest]—although not within the time frame originally established by Mr. DiLieto.

The Special Master and the DRB reached different conclusions respecting whether the evidence clearly and convincingly established a knowing misappropriation of trust funds. Both agreed, however, that respondent borrowed the money from Siwakowski without first disclosing that he was the borrower and without advising Siwakowski to consult with independent counsel with regard to the matter. Respondent concedes that he did not inform Siwakowski that he was the borrower until five months after he had borrowed the $30,500.

Although we find that the record does not clearly and convincingly establish a knowing misappropriation of the Siwakowski funds, respondent's failure to tell Siwakowski for at least five months that he was the borrower constitutes intentional deception and dishonesty in violation of *RPC* 8.4(c). He also failed to advise his client to seek the advice of independent counsel respecting the matter, constituting a violation of *RPC* 1.7(b)(2), *RPC* 1.8(a) and *RPC* 1.15(à) and (d).

## III

The real estate transactions involving Walsh, Lombardi and Cassidy are more complicated. By way of background, the OAE's formal complaint against respondent had alleged that respondent withdrew from his attorney trust account the sum of $26,150 between April 30, 1987, and September 30, 1987, during which period respondent had no fees on deposit in his attorney trust account to cover those withdrawals. The challenged withdrawals are the following:

| Check # | Date | Amount |
|---|---|---|
| 5823 | 5/01/87 | $ 2,500 |
| 5848 | 5/13/87 | 2,500 |
| 5876 | 6/16/87 | 2,500 |
| 5894 | 6/26/87 | 2,000 |
| 5903 | 7/07/87 | 2,500 |
| 5910 | 7/13/87 | 2,000 |
| 5913 | 7/17/87 | 2,000 |
| 5935 | 7/31/87 | 2,000 |
| 5950 | 8/07/87 | 2,000 |
| 5952 | 8/11/87 | 1,200 |
| 5959 | 8/21/87 | 1,750 |
| 5969 | 8/28/87 | 2,000 |
| 5985 | 9/18/87 | 1,200 |

Total $26,150

In respondent's answer to the OAE's complaint, he asserted that a portion of the money withdrawn from his trust account during the period referred to in the OAE's complaint consisted of deposits in real estate transactions with respect to which respondent's clients

had authorized the withdrawals. The clients were Martin J. Walsh and Kenneth Lombardi. Accordingly, the testimony at the hearing before the Special Master focused on whether respondent had been authorized by Walsh and Lombardi to withdraw funds deposited in respondent's trust account because such authorizations might have afforded respondent a defense to the OAE's charge of knowing misappropriation of client trust funds.

## A

Walsh and respondent were college roommates and remained friends thereafter. Respondent represented Walsh in several real estate transactions between 1965 and 1987.

Respondent represented Walsh in April 1987 in connection with Walsh's sale of realty and the "Irish Cottage," a bar and restaurant, to Eugene Day, Henry Wright, Reginald Hyde and Richard Hyde for $600,000. The buyers made a $25,000 down payment that respondent deposited in his trust account on April 29, 1987. The deposit was to be held in escrow until closing.

Separate contracts for the sale of the realty and the business were interdependent and each contained some contingencies. The contingencies respecting the sale of the business were more onerous than those pertaining to the sale of the realty. If the contingencies were not satisfied, the contract could be canceled and all deposits returned.

While holding the $25,000 in his trust account, respondent approached Walsh and "indicated to him that the beginning of 1987 was sort of lean for me, and that I would like to have the use of those funds if I could get them released." Walsh owed respondent fees for other legal matters and he agreed the funds could be released provided that they would be available when needed to resolve a pending lawsuit filed by the Sands Hotel and Casino against Walsh for payment of a $24,000 gambling debt. Respondent assured Walsh the money would be available when the casino dispute was resolved.

After Walsh agreed to release the deposit, respondent contacted John S. Power, Esq., the attorney for the buyers, to ask for the release of the deposit. According to respondent, he pointed out to Mr. Power that there were no unsatisfied contingencies on the sale of the real estate and that the contingencies on the sale of the business had been almost resolved. He asked Mr. Power to obtain the buyers' authorization to release the deposit for the use of Mr. Walsh. Respondent did not disclose to Mr. Power, however, that the money was for himself.

After consultation with Mr. Day, the buyers' representative, Mr. Power informed respondent that the deposit could be released to Walsh. Respondent alleges that the withdrawals from his trust account that were made between May 10 and September 18, 1987, included his loan of $25,000 from the deposit in the Walsh transaction. We note that testimony was elicited at the hearing before the Special Master that contradicts that assertion. For example, a deputy ethics counsel testified to conversations with respondent in which respondent acknowledged that the Walsh funds had remained intact until after the closing of the Walsh matter on October 23, 1987. In addition, respondent's ledger card for the Walsh transaction reflects a disbursement from the deposit funds of a $15,000 check on November 20, 1987, to pay off an indebtedness owned by Walsh to the Sands Casino. The only payment to respondent from the account reflected on his ledger card is a $5,000 fee disbursed on November 20, 1987. Because of the contradictory testimony, we are unable to conclude from the record whether respondent in fact borrowed the $25,000 from the Walsh deposit during the period May 10 to September 18, 1987, as claimed. In any event, the closing eventually occurred and neither Walsh nor the buyers sustained any damage by virtue of respondent's nondisclosure to Mr. Power that the money allegedly was to be advanced to respondent.

The Special Master found a knowing misappropriation of trust funds based on In re Hollendonner, supra, because respondent failed to disclose to Mr. Power that respondent, not Walsh, was

the borrower. Because the buyers agreed to release the deposit to Walsh, and Walsh agreed that respondent could use the deposit to satisfy a debt Walsh owed respondent, we find that the evidence does not clearly and convincingly establish a knowing misappropriation. Respondent's conduct, however, constitutes intentional deception and dishonesty in violation of *RPC* 8.4(c). Full disclosure to the buyers was essential to making an informed decision whether to release the deposit prior to closing of title. Respondent deprived them of that opportunity.

*B*

Respondent was a friend of Kenneth Lombardi for over forty years. Timothy Cassidy was the sole shareholder of M.C. Investors, Inc. (M.C. Investors), a real estate company. Lombardi owned a vacant lot in Asbury Park that he wanted to sell to M.C. Investors. Respondent represented Lombardi in the sale of the lot. Neither M.C. Investors nor Cassidy however, was represented by counsel during contract negotiations.

Under a contract of sale dated September 25, 1987, Lombardi agreed to sell the lot to M.C. Investors for the purpose of constructing condominiums. The contract contained many contingencies, including a provision affording the purchaser six months to obtain all necessary approvals, permits, variances and financing to construct forty-eight condominium units. The contract required a $15,000 deposit, payable in three equal installments. An addendum to the contract also provided that Lombardi had the option to cancel or extend the contract if the contingencies were not satisfied in six months. The contract was silent respecting any forfeiture of deposit if Cassidy did not comply with its terms.

Cassidy made three $5,000 deposits, the first on August 21, 1987. The second and third were made in October and December, 1987. Under the contract, respondent was to hold the deposit in escrow "until closing of title and deed transfer." Cassidy testified that he never authorized the release of any of the deposit money.

Cassidy was unable to obtain construction financing to build the condominiums within the six months contemplated under the contract. Consequently, on March 11, 1988, he requested that respondent return the deposit. Subsequent requests to return the deposit were made on April 9, 1988, August 17, 1988, and April 26, 1989. Respondent never returned any portion of the $15,000 deposit.

Although the contract did not provide for forfeiture of any of the deposit based on Cassidy's untimely performance, Lombardi testified that when he learned that Cassidy was not proceeding expeditiously to satisfy the contract contingencies, he told Cassidy "you're going to forfeit your deposit." Cassidy, however, did not respond to that assertion. Lombardi also testified that at some unspecified time after the contract was signed, he told Cassidy that he "was going to use [the deposit]" and Cassidy "didn't say anything to me."

At about the same unspecified time, respondent told Lombardi that "he was in need of money and [Lombardi] said, well you have the deposit from Mr. Cassidy. [Lombardi] said take it from there, because right now I can't afford to use any, you know, advance you any money out of the business." Lombardi owed respondent fees for services rendered in other matters. Lombardi testified that he informed respondent about the assertions Lombardi had made to Cassidy respecting the forfeiture and use of the deposit.

Respondent testified that he had discussions with Lombardi and that Lombardi authorized his use of the deposit. Respondent admits that he did not have any discussions with Cassidy respecting use of the deposit and that he did not have authorization from Cassidy to use the deposit for his own purposes.

The closing on the lot did not occur. Despite Cassidy's demands for the return of his $15,000 deposit, respondent never complied. Respondent used the deposit to reduce the $30,000 to $40,000 indebtedness for legal fees owed him by Lombardi.

The DRB majority concluded that respondent obtained authorization from Lombardi but not from Cassidy to use the deposit. It further concluded:

> Nevertheless, in light of Mr. Lombardi's testimony that the deposit was nonrefundable or that it had been forfeited because of the buyer's default under the agreement, and that Mr. Lombardi had communicated this fact to respondent, then respondent's honest, but mistaken, belief that the deposit could be released to Mr. Lombardi (who, in return, would allow respondent to use it by way of outstanding legal fees) belies knowing misappropriation. *See In re Rogers,* 126 *N.J.* 345, 599 *A.*2d 141 (1991) (attorney not disbarred after he failed to pay a mortgage following a real estate closing because of good faith belief that the individual who held the mortgage had authorized the use of the monies for the attorney's own purposes as a short-term loan).
>
> As in *Rogers,* although respondent's belief could have been incorrect, the Board cannot conclude from this record that respondent's misuse of the deposit was "knowing." The Board also notes that, after the transaction fell through, the buyer elected not to file suit to recover the deposit.

Our independent review of the record persuades us to reject the DRB majority's conclusion that respondent had a good faith belief that he could use the deposit because of Lombardi's authorization.

The real estate contract and its addendum were drafted by respondent. Thus, he knew there was no contractual basis to claim a forfeiture. Although the contract form contains printed language to provide for liquidated damages, the provision was not completed. That indicates the parties did not contemplate a forfeiture of the deposit. Indeed, the contract provided that the deposits "paid on account of this contract ... are made liens thereon," but shall not continue as liens after default of purchaser. There were no other contractual consequences for default. Moreover, Lombardi did not testify that he and Cassidy ever reached an oral agreement that the deposit was nonrefundable or would be forfeited.

It was stipulated that respondent received a total deposit of $15,000. The first of these payments was made on August 21, 1987, before the contract was signed, and the subsequent payments on October 28, 1987, and December 21, 1987. These dates, however, could not be verified by any record. Only the August 21

payment could be identified as being deposited into respondent's attorney trust account on a specific date, namely August 21, 1987.

The auditors were unable to determine from the record when respondent used the deposit for personal purposes. However, his verified answer to the formal disciplinary complaint is informative. There he states that when the initial $5,000 deposit was made on August 21, 1987,

> Lombardi indicates to respondent that he could use the deposit, because he had an agreement with the buyer, that he could use the deposit for the property carrying charges such as taxes, insurance and maintenance. Lombardi authorized and approved of Respondent's using the $5,000 on hand [in payment of attorney fees on matters concluded], and that when the additional $10,000 deposit was made by the buyer, Respondent could apply the $10,000 to attorney fees.

Respondent also asserted in his answer that the buyer "did not comply with the terms of the contract, and was declared in breach of contract. The $15,000 deposit was forfeited to Lombardi. Respondent applied the $15,000 against attorney fees owed to him by Lombardi." Despite the foregoing, we do not know precisely when respondent used the deposit for his personal purposes.

In correspondence between respondent and Cassidy from October 27, 1987, to May 1, 1989, respondent never mentioned the alleged oral agreement that the deposit was not refundable or that it could be forfeited if the contract contingencies were not met. The first letter from respondent asserting a forfeiture claim was dated May 5, 1989, approximately fourteen months after the alleged default.

The DRB's reliance on *In re Rogers,* 126 *N.J.* 345, 599 *A.*2d 141 (1991) is misplaced. Rogers represented the Hulls in a purchase of realty from the Homers. The Homers had given a mortgage to Yagoda, and Rogers escrowed $29,289.31 at the closing to pay off that mortgage and discharge it from the record. The check issued to pay off the mortgage was returned for insufficient funds because American Express had made a levy against Rogers' trust account to satisfy Rogers' personal obligation to that company. Rogers did not learn of the levy until the check issued to pay off

the mortgage was dishonored. Rogers was out of trust solely because of that levy.

When American Express was informed that the levy had been made on the attorney's trust account, it returned all but $200 of the money. Upon receipt of the American Express check, Rogers deposited it into his overdrawn business account.

Rogers had substantial contact with Yagoda immediately after the trust account check was dishonored. *Rogers, supra*, 126 *N.J.* at 356, 599 *A.*2d 141. He informed Yagoda about what had happened and Yagoda agreed to accept an initial payment of $25,789.31 and to receive the remaining $3,500 as soon as Rogers' financial difficulties had been resolved. *Ibid.* When Rogers received the check from American Express, he sent Yagoda $1,000. *Id.* at 349, 599 *A.*2d 141. He later sent Yagoda $1,500 in three installments.

When deciding whether Rogers had knowingly misappropriated trust funds by not turning over the American Express check to Yagoda or depositing it into his trust account, the Court found that under the circumstances it was not unreasonable for Rogers to believe that Yagoda had accepted Rogers' offer to be personally responsible for repaying the mortgage. *Id.* at 356–57, 599 *A.*2d 141. The Court found that Rogers' conduct "corroborated his asserted belief that his promise to pay superseded his obligation to pay the mortgage out of the escrow funds." *Id.* at 357, 599 *A.*2d 141. In addition, Rogers also returned the mortgage that Yagoda had sent him for cancellation and offered to sign a document, such as a note, acknowledging his obligation to personally repay the mortgage.

Similarly, *In re Chidiac*, 120 *N.J.* 32, 575 *A.*2d 1355 (1990), involved an attorney disciplinary matter in which the attorney had a good faith belief that he was not required to deposit into his attorney trust account funds belonging to the owner of rental housing because he believed he was acting as a property manager and not as an attorney. *Id.* at 34, 575 *A.*2d 1355. Even though an attorney may act as a business person as well as perform the

functions of an attorney, he or she must act in the transaction in accordance with high professional standards. *In re Genser,* 15 *N.J.* 600, 606, 105 *A.2d* 829 (1954). The Court found that substantial evidence existed to support Chidiac's good faith belief that his use of a client's funds was authorized by the client. *Chidiac, supra,* 120 *N.J.* at 33–38, 575 *A.2d* 1355.

In contrast, respondent did not demonstrate a basis for good faith reliance on Lombardi's alleged statement that Cassidy had agreed that the deposit was nonrefundable. Indeed, Cassidy demanded that respondent return the deposit about two weeks before the six-month contingency period expired, and he repeatedly requested that respondent return the deposit during 1988 and 1989. Notwithstanding the fact that respondent had drafted an escrow agreement as part of the contract of sale that did not provide for a forfeiture of deposit or any liquidated damages, respondent never contacted Cassidy before using the $15,000 deposit held in escrow. Respondent had to be aware of the necessity to obtain authorization from the buyer or his attorney before using the deposit because he followed that procedure in the Walsh matter only four months before receiving the first deposit from Cassidy.

We have held that "willful blindness satisfies [the] requirement of knowledge." *In re Skevin,* 104 *N.J.* 476, 486, 517 *A.2d* 852 (1986), *cert. denied,* 481 *U.S.* 1028, 107 *S.Ct.* 1954, 95 *L.Ed.2d* 526 (1987). "The intentional and purposeful avoidance of" knowledge of what Cassidy would have said if asked whether Lombardi could keep the deposit "will not be deemed a shield against proof of what would otherwise be a 'knowing misappropriation.'" *In re Johnson,* 105 *N.J.* 249, 260, 520 *A.2d* 3 (1987). Under the circumstances of this case, no basis exists in the record to support the good faith belief found by the DRB.

Furthermore, an attorney cannot satisfy his or her professional responsibility with respect to escrow funds by simply relying on information from a client that is contrary to escrow documents prepared by that attorney. The absence of a forfeiture provision

in the contract coupled with Cassidy's demands for return of the deposit placed respondent on notice that the buyer had not forfeited the deposit. "It is not enough simply to follow a client's instructions." *In re Wallace,* 104 *N.J.* 589, 593, 518 *A.*2d 740 (1986). When the circumstances dictate that other reasonable inquiry be conducted, there can be no good faith reliance on what the client says.

*In re Wilson, supra,* 81 *N.J.* at 453, 409 *A.*2d 1153, requires disbarment when the record clearly and convincingly demonstrates that a lawyer has knowingly misappropriated a client's funds. *In re Noonan,* 102 *N.J.* 157, 160–61, 506 *A.*2d 722 (1986). Knowing misappropriation "consists simply of a lawyer taking a client's money entrusted to him … knowing that the client has not authorized the taking." *Id.* at 159, 506 *A.*2d 722. No distinction is to be made between a client's trust funds and escrow funds belonging to nonclients. We observed in *In re Hollendonner, supra,* 102 *N.J.* at 28, 504 *A.*2d 1174 that

it is a matter of elementary law that when two parties to a transaction select the attorney of one of them to act as the depository of funds relevant to that transaction, the attorney receives the deposit as the agent or trustee for both parties. (citations omitted) The parallel between escrow funds and client trust funds is obvious.

We find that the record clearly and convincingly establishes that respondent knowingly misappropriated the Cassidy deposits, thereby triggering the *Wilson* automatic disbarment rule.

In addition, the totality of the evidence against respondent reveals a pattern of intentional deception and dishonesty that clearly and convincingly demonstrates that "his ethical deficiencies are intractable and irremediable." *In re Templeton,* 99 *N.J.* 365, 376, 492 *A.*2d 1001 (1985). His conduct has destroyed "totally any vestige of confidence that [he] could ever again practice in conformity with the standards of the profession." *Ibid.* Disbarment is the only appropriate sanction.

## IV

We agree with the DRB that the two audits revealed numerous record keeping deficiencies: Respondent retained earned fees in

his attorney trust account rather than transferring those fees to his business account in violation of *Rule* 1:21–6(a)(2); he did not prepare three-way reconciliations in violation of *Rule* 1:21–6(b)(8); no running balance was maintained in his attorney trust account checkbook, and client ledger cards failed to reflect all transactions in the account as well as the account balance contrary to *Rule* 1:21–6(c).

We hereby order that respondent be disbarred. He shall reimburse the Disciplinary Oversight Committee for appropriate administrative costs, including the costs of transcripts.

For Disbarment—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN join in this opinion.—7.

Opposed—None.

## ORDER

It is ORDERED that LOUIS R. DI LIETO of ASBURY PARK, who was admitted to the bar of this State in 1965, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that LOUIS R. DI LIETO be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by LOUIS R. DI LIETO, pursuant to *Rule* 1:21–6, be restrained from disbursement except upon application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court who is directed to deposit the funds in the Superior Court Trust Fund, pending further Order of this Court; and it is further

ORDERED that LOUIS R. DI LIETO comply with *Rule* 1:20–20 dealing with disbarred attorneys; and it is further

ORDERED that LOUIS R. DI LIETO reimburse the Disciplinary Oversight Committee for appropriate administrative costs.