730 A.2d 362

IN THE MATTER OF JAMES R. PICCIANO,
AN ATTORNEY AT LAW.

Argued March 29, 1999—Decided June 18, 1999.

*Walton W. Kingsbery, III,* Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*James R. Picciano,* argued the cause *Pro se.*

PER CURIAM.

This attorney discipline matter arises from a Report and Recommendation of the Disciplinary Review Board (DRB) that respondent be disbarred. Four members of the DRB concluded that respondent had knowingly misappropriated $17,000 in client trust funds following the settlement of a personal injury action. Three members dissented concerning that issue, finding that the attorney had the permission of his client. All members found that respondent had knowingly invaded escrow funds retained from the same settlement. The funds had been placed in escrow pending an agreement with the client's physician regarding the amount of the physician's bill. Although we would hesitate to disbar respondent for the conduct surrounding the disposition of the client's $17,000 share of the settlement proceeds, we find clear and convincing evidence, based on our independent review of the record, that respondent knowingly made an unauthorized use of the escrow funds held for the physician. Such an unauthorized use without the permission of the person for whom the escrow fund was held constitutes a knowing misappropriation of trust funds that warrants disbarment under the rule of *In re Wilson,* 81 *N.J.* 451, 409 *A.*2d 1153 (1979).

I

The matter involves respondent's representation of Mary Milanese in connection with a personal injury that she sustained on

August 5, 1991. An electrician dropped a metal ladder on her while she was shopping in an IGA supermarket. The case was settled in October 1993 for $27,000. The settlement was paid by three checks. Harleysville Insurance Company paid the electrician's share of $23,000 on October 29, 1993. Respondent did not receive two other checks for $3000 and $1000 from the IGA's agents until December 7, 1993.

On October 29, 1993, respondent deposited $20,000 of the $23,-000 Harleysville check into his attorney business account with the notation "cash substitution." He did not make any distribution of the proceeds to his client. He took the remaining $3000 of the Harleysville check in cash. On December 7, 1993, respondent deposited the $1000 IGA check into his attorney trust account and the $3000 IGA check into his business account.[1] On December 8, 1993, respondent deposited $17,000 in his trust account. The funds came from a corporation owned by his wife. The deposit replaced the $17,000 in client's funds that respondent had put into his attorney account in October.

Two days later, on December 10, 1993, Milanese and respondent signed a settlement statement itemizing disbursements of the $27,000. According to that statement, $17,000 of the settlement was to be disbursed to the client, $5000 was to be paid to respondent as his fee, and the remaining $5000 would be paid to the client's treating physician. Specifically, the Settlement Statement read as follows:

> Since it appears that at the present time Doctor Houck is willing to settle his claim for no less than $5000, I have held this amount and will continue, per your instructions, to see if he will lower his amount any more. I have also held and will be responsible for a medical bill in the approximate amount of $300. My attorney's fee is being set at $5000 less the amount that I have agreed to pay for that small remaining medical bill. If I can get Doctor Houck to agree to a lesser figure then you will receive the additional funds.

---

[1] Respondent paid $1000 to the physician from his trust account on February 23, 1994.

Respondent admitted that although he represented in the settlement statement that he was holding the $5000 in escrow, in reality the funds had, with the exception of the $1000 IGA check, gone into his business account.

Ultimately, the physician did not agree to reduce his bill to an amount less than $5000. The physician died in 1994. His estate pursued payment of the $4000 balance and filed the grievance giving rise to this proceeding. After investigation, the Office of Attorney Ethics (OAE) charged that respondent had misappropriated the $17,000 that he had put in his business account for the forty-four days between October 29, 1993 and December 11, 1993, and that he had misused $4000 in escrow funds. A Special Master, after hearing the evidence, concluded that the evidence did not clearly and convincingly establish that respondent misappropriated the $17,000 for the forty-four days. Respondent claimed that he had consent to borrow the $17,000. Respondent testified that his client's son told him that she had agreed that he could use the money as long as she were paid before Christmas. Both the mother and son confirmed this claim by respondent.

The Special Master, found, however, as did the DRB, that respondent agreed that he would hold the $5000 in escrow while he negotiated with the physician and would return to the client whatever funds were not required for a final settlement of the physician's bill. (Recall that respondent later paid $1000 to the physician from the trust account.) The funds were to be held either for the doctor or the client *if* the doctor consented to a lower sum for his fee. Respondent was not successful in persuading the physician to waive any part of the $4000 balance.

Respondent acknowledged his obligation to pay the physician's bill, but said that he had delayed doing so in the hope that his client's son would cover the debt. Whatever respondent's relationship with his client's son, respondent should not have withdrawn the escrowed funds without the consent of the party for whom they were held. *In re DiLieto*, 142 *N.J.* 492, 507, 665 *A.*2d 1094 (1995). See also *In re Kernan*, 118 *N.J.* 361, 368, 571 *A.*2d

1282 (1990) (declining to impose discipline because of absence of clear and convincing evidence that physician "had an interest in the [retained] fund") and *In re Peterman,* 134 *N.J.* 201, 632 *A.*2d 271 (1993) (declining to disbar because unauthorized use of funds intended for physician predated our decision in *In re Hollendonner,* 102 *N.J.* 21, 504 *A.*2d 1174 (1985), in which we prospectively announced that we would apply *Wilson* rule to attorney found to have used escrow funds without permission of one of parties having interest in funds). The evidence clearly and convincingly established that respondent knowingly misused escrow funds in violation of the *Hollendonner* rule.

We order the disbarment of respondent. Respondent shall reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

*For disbarment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—none.

## O R D E R

It is ORDERED that **JAMES R. PICCIANO** of **DEEPWA-TER,** who was admitted to the bar of this State in 1972, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that **JAMES R. PICCIANO** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by **JAMES R. PICCIANO,** pursuant to *Rule* 1:21–6, be restrained from disbursement except on application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior

Court, who is directed to deposit the funds in the Superior Court Trust Fund, pending further Order of this Court;  and it is further

ORDERED that **JAMES R. PICCIANO** comply with *Rule* 1:20–20 dealing with disbarred attorneys;  and it is further

ORDERED that **JAMES R. PICCIANO** reimburse the Disciplinary Oversight Committee for appropriate administrative costs.